**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN CORTI EMMERSON and ANNE EMMERSON, | Civil Action No. |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| KNICKERBOCKER FUNDING LLC, AFP ADVISORS, LLC, ART FINANCE PARTNERS LLC and ANDREW C. ROSE, | |
| Defendants. | |

Plaintiffs, John Corti Emmerson ("Mr. Emmerson") and Anne Emmerson ("Mrs. Emmerson") (together, "Plaintiffs"), bring suit against defendants Knickerbocker Funding LLC ("Knickerbocker"), AFP Advisors, LLC ("AFP Advisors"), Art Finance Partners LLC ("AFP") and Andrew C. Rose ("Rose")(Knickerbocker, AFP Advisors, AFP and Rose together, "Defendants"), and hereby allege as follows:

## NATURE OF ACTION

1.  Plaintiffs are the rightful and sole owner of a certain work of art by the Dutch Artist Joachim Anthonisz Wtewael, titled CARITAS, Oil on panel, and with the dimensions 15.1 x 23.2 in (38.4 x 59 cm) (the "Artwork").

2.  The Artwork has been wrongfully converted by Defendants.

3.  Plaintiffs seek replevin of the Artwork, and damages for conversion and aiding and abetting a breach of fiduciary duty.

## PARTIES

4.  Plaintiff, John Corti Emmerson, is a natural person, with a primary residence in London, in the United Kingdom.

5.  Plaintiff, Anne Emmerson, is a natural person, with a primary residence in London, in the United Kingdom.

6.  Defendant Knickerbocker Funding LLC is a Delaware limited liability company, registered to do business in New York, with a place of business at 41 E. 57th Street, Suite 702, New York, New York 10022.

7.  Defendant AFP Advisors, LLC is a Delaware limited liability company, registered to do business in New York, with a place of business at 41 E. 57th St., Suite 702, New York, New York 10022.

8.  Defendant Art Finance Partners LLC is a Delaware limited liability company, registered to do business in New York, with a place of business at 41 E. 57th St., Suite 702, New York, New York 10022.

9.  Defendant Andrew Rose is a natural person, and, on information and belief, the owner or holder of a controlling interest in Art Finance Partners LLC, AFP Advisors, LLC and Knickerbocker Funding LLC; on information and belief, Rose maintains his place of business at 41 E. 57th St., Suite 702, New York, New York 10022, and on information and belief is a resident of New York City, New York.

## JURISDICTION AND VENUE

10. Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1332(a)(2), as there is diversity of citizenship, and the amount in controversy exceeds $75,000.00.

11. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391, as a substantial part of the events and omissions giving rise to the claim occurred in the Southern District of New York.

## STATEMENT OF FACTS

12. Plaintiffs are the rightful and sole owners of a unique and valuable painting by the Dutch artist Joachim Anthonisz Wtewael, titled CARITAS, Oil on panel, and with the dimensions 15.1 x 23.2 in (38.4 x 59 cm) (the "Artwork").

13. On January 23, 2013, Plaintiffs entered into an agreement with non-party Timothy Sammons Ltd. ("TSL"), for the consignment and sale of several works of art owned by Plaintiffs, including the Artwork. A true and correct copy of the consignment agreement is attached hereto as **Exhibit A** (the "Consignment Agreement").

14. Under the terms of the Consignment Agreement, TSL was to act as Plaintiffs' agent for the sale of the Artwork for an anticipated price of £300,000-£500,000, via private sale or auction.

15. Section 1 of the Consignment Agreement states that the appointment of TSL is "exclusive to TSL" and to no other party. Ex. A at Section 1.

16. Under no circumstances did the Consignment Agreement contemplate a consignment to Timothy Sammons ("Sammons") in his personal capacity.

17. The Consignment Agreement stated that, in the event the Artwork remained unsold, Plaintiffs would be entitled to an immediate return of the Artwork upon payment of the expenses due under the Consignment Agreement. Ex. A at Schedule 2.

18. TSL did not inform Plaintiffs of any sale of the Artwork at any point during the term of the Consignment Agreement.

19. TSL did not pay Plaintiffs any proceeds from any sale of the Artwork at any time.

20. Plaintiffs are unaware of any sale of the Artwork to a third-party and did not receive sale proceeds from any third-party from any sale of the Artwork.

21. TSL did not return the Artwork to Plaintiffs.

22. TSL refused to return the Artwork or to provide information regarding the status or location of the Artwork after numerous demands by Plaintiffs and Plaintiffs' counsel.

23. On May 18, 2015, after numerous demands for information from Plaintiffs and their counsel, Sammons emailed Plaintiffs' counsel stating that the "Caritas is in New York, currently at SRI and I am in the process of transferring control to Charles Cochrane."

24. On information and belief, "SRI" refers to Stebich Ridder International, a fine art storage and shipping company headquartered in New York City.

25. Charles Cochrane was a director of TSL at the time of the Consignment Agreement.

26. Plaintiffs were unaware of any transfer of the Artwork to New York and never authorized any sale or transfer to SRI.

27. After continued evasive statements from Sammons regarding the location of the Artwork, Plaintiffs discovered that Sammons' U.K. company, TSL, had become insolvent and was in the process of being wound up in a U.K. Insolvency Service proceeding.

28. On May 22, 2015, TSL's U.K. counsel informed Plaintiffs' U.K. counsel that "The Caritas is currently in New York either at the offices of AFP Advisors LLC, or in storage at Stebich Ridder Intl."

**Plaintiffs' Discovery of the Loan Agreement**

29. Shortly after learning of TSL's insolvency, Plaintiffs learned that Sammons, jointly with a company known as "Timothy Sammons, Inc." ("TSI"), had entered into a Loan and Security Agreement (the "Loan Agreement") with Knickerbocker on June 9, 2014. A true and correct copy of the Loan Agreement is attached hereto as **Exhibit B**.

30. TSI was formally dissolved with the New York Secretary of State nearly three years before the Loan Agreement was executed.

31.  The Loan Agreement transaction was consummated exclusively on behalf of Sammons in his personal capacity.

32. Despite his lack of authorization to sell or transfer the works, Sammons purported to have an ownership interest in the Artwork in obtaining the loan from Knickerbocker for his personal benefit.  Ex B. at 5(c).

33. Under the Loan Agreement, Knickerbocker loaned $600,000 to Sammons, which was secured by Sammons' purported ownership interest in the Artwork.  Ex. B at 2.

34. On information and belief, Knickerbocker was fully aware that neither TSI nor Sammons owned the Artwork and did not conduct reasonable due diligence into the true ownership of the Artwork.

35. On information and belief, Knickerbocker and the other Defendants, who each played an integral role in the Loan Agreement transaction, failed to request any documents relating to the rightful ownership of the Artwork and were aware of Sammons severe financial turmoil at the time of the Loan Agreement transaction.

36. The Loan Agreement provides that the Artwork would be held as collateral for the loan at "Art Finance Partners LLC, New York or at London shipper (until export permit has been granted)." Ex. B at "Exhibit A."

37. On June 10, 2014, Andrew Rose, on behalf of AFP, filed a UCC-1 financing statement, which asserted a security interest in the Artwork held by Knickerbocker and named AFP as a notice party.

38. Rose, AFP and AFP Advisors were fully aware that neither TSI nor Sammons owned the Artwork and did not conduct reasonable due diligence into the true ownership of the Artwork.

39. Upon information and belief, the Artwork is currently located at 41 E. 57th Street, Suite 702, New York, New York 10022, in the possession of Defendants.

40. Plaintiffs remain the rightful and sole owners of the Artwork.

**Rose and His Companies**

41. AFP, AFP Advisors, Knickerbocker, Rose, and other officers and employees of AFP, AFP Advisors, and Knickerbocker are experienced financiers and collectors of, and dealers in, works of fine art.

42. On information and belief, Rose is the President, CEO or controlling person for AFP, AFP Advisors, and Knickerbocker.

43. Rose and AFP have been involved in a number of art-related scandals, many of which have resulted in lawsuits.

44. For example, AFP and Rose were sued by the now-defunct Berry-Hill Galleries for allegedly engaging in a "continuous and ongoing pattern of deceptions, misrepresentations and omissions."  In fact, a senior executive at Christies, Inc., a leading auction house, publically remarked at the time of that lawsuit that the conduct of Rose caused Christie's "to have suffered significant damages" and promptly filed suit against Rose for breach of contract.

45. In addition, there are several active matters, many before this very Court, that allege art related wrongdoing by Rose, AFP, AFP Advisors, and Knickerbocker.[1]  The facts of these matters are similar to the facts described in this Complaint and all include some combination of Sammons, Rose and his related companies.

---

[1] See *Overton v. Art Finance Partners LLC, et al.*, 15-cv-3927 (SAS); See also *Imogen Lorna Priscilla Jaretzki, et al., v. Art Finance Partners LLC, et al.,* 15-cv-04109 (SAS).

### FIRST CLAIM FOR RELIEF
### (Replevin – Against All Defendants)

46. Plaintiffs repeat and reallege the allegations of Paragraphs 1-45 as if set forth in full herein.

47. Plaintiffs are the rightful and sole owners of the Artwork.

48. The Artwork is a valuable and unique chattel, and should be immediately returned to Plaintiffs.

49. Defendants are in possession of the Artwork.

50. Plaintiffs' right to possession of the Artwork is superior to any right claimed by Defendants.

51. Defendants have unlawfully retained possession of the Artwork.

52. As a result of the foregoing, Plaintiffs are entitled to the return of the Artwork.

### SECOND CLAIM FOR RELIEF
### (Conversion – Against All Defendants)

53. Plaintiffs repeat and reallege the allegations of Paragraphs 1-52 as if set forth in full herein.

54. Plaintiffs are the rightful and sole owners of the Artwork.

55. Plaintiffs' right to possession of the Artwork is superior to any right claimed by Defendants.

56. Defendants nonetheless (i) assumed and exercised rights of ownership over the Artwork, and (ii) attempted to commercially exploit their claimed ownership interest in the Artwork.

57. Plaintiffs have been damaged as a result of Defendants' unlawful conversion in an amount to be proven in trial, but in excess of $536,557.

## THIRD CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty – Against All Defendants)

58. Plaintiffs repeat and reallege the allegations of Paragraphs 1-57 as if set forth in full herein.

59. TSL owed a fiduciary duty to Plaintiffs by virtue of being the consignee of the Artwork.

60. TSL breached its fiduciary duty to Plaintiffs by purporting to transfer a security interest in the Artwork to Knickerbocker, and to allow Defendants to take possession of the Artwork in violation of the terms of the Consignment Agreement.

61. On information and belief, Defendants were aware that Sammons was not the true owner of the Artwork.

62. On information and belief, Defendants nonetheless knowingly induced Sammons to enter into the Loan Agreement, purporting to transfer a security interest in the Artwork to Knickerbocker.

63. Defendants directly participated in TSL's breach of its fiduciary duty by inducing Sammons to enter into the Loan Agreement.

64. Defendants' actions were knowingly deceitful and maliciously intended to cause Plaintiffs' harm and to enrich themselves at Plaintiffs' expense.

65. Plaintiffs have been damaged as a result of Defendants' aiding and abetting TSL's breach of fiduciary duty in an amount to be proven in trial, but in excess of $536,557.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

a. Ordering Defendants to immediately return the Artwork to Plaintiffs;

b. Ordering Defendants to pay damages to Plaintiffs, including punitive damages, from the conversion of the Artwork, should it not be returned to Plaintiffs;

c.  Pre-judgment and post-judgment interest;

d.  Plaintiffs' costs of this action;

e.  Plaintiffs' reasonable attorneys' fees;

f.  Punitive damages; and

g.  Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial with respect to all issues triable before a jury.


Dated: June 4, 2015

<div style="margin-left:40%">

BOWLES LIBERMAN & NEWMAN LLP
*Attorneys for Plaintiffs*

David K. Bowles
Enrique E. Liberman
Jared B. Spiegel
54 W. 21st Street, Suite 1007
New York, New York 10010
T: (212) 390-8842
F: (866) 844-8305
E: dbowles@blnlaw.com

</div>

EXHIBIT A



TIMOTHY
SAMMONS
FINE ART AGENTS

# SALES AGREEMENT

## PROPERTY FROM THE ESTATE OF MRS LILIAN EDITH MARY FORTE BELONGING TO MR & MRS JOHN EMMERSON

Date: 23. 1. 2013

TIMOTHY SAMMONS LTD
12 BOLTON STREET
LONDON W1J 8BD
TEL: +44 020 8095 9096
FAX: +44 020 8095 9096
london@timothy-sammons.com

www.timothy-sammons.com

This agreement dated this 23 day of January 2013, is made between John Corti Emmerson and Anne Emmerson both of Court Farmhouse, Wylye, Wiltshire, BA12 0RF as the specific beneficiaries to the estate of the late Mrs Lilian Edith Mary Forte as the owners of the Property (hereinafter known as the "Owners"), Timothy Sammons Ltd of 12 Bolton Street, London, W1J 8BD (hereinafter known as "TSL")

NOW THEREFORE, for good and valuable consideration, the sufficiency of which is hereby acknowledged, the Owners and TSL agree as follows:

Definitions:

Property means the item of property listed in Schedule 1 (the "Property")
Letter means our letter to the Owners of the Property of January 2013 set out in Schedule 2 (the "Letter")

Words as used in this agreement, "we", "us", "our" and "TSL" mean Timothy Sammons Ltd and any affiliated company and "you", "your" and the Owners means John Corti Emmerson and Anne Emmerson as the specific beneficiaries of the Property from the estate of the late Mrs Lilian Edith Mary Forte.

1. Agent

You instruct us to act as your agent for the purposes of sale of the Property.  This appointment is exclusive to TSL.

2. Method of Sale and Consignment

You agree to consign the Property for sale as set out in the Letter and the terms of which will once signed by you from part of this Agreement.

3. Commission, Expenses and Insurance

As set out in the Letter you authorise us to:

3.1 deduct a commission and retain it for our account.

3.2 incur expenses on your behalf and you agree to repay them or that they may be deducted and retained

3.3 insure the Property and you agree to repay that cost or that we may deduct and retain it

4. Owner's Warranties

4.1 You warrant to us that you are the owner of the Property and that you can and shall transfer possession with good and marketable title to the Property free of all third party claims or potential claims and that you agree to indemnify us against any loss or damage resulting from any breach of these warranties and representations. We may rescind any sale where we reasonably believe that any of these warranties and representations have been or will be breached.

4.2 Should we withdraw the Property from any sale or should we have to rescind a sale we have the right to retain the Property until you have paid in full any monies payable under this Agreement and the Letter as set out below.

5.  Lien

5.1 You agree that we shall have the right to retain possession of the Property until we have received from you all monies due under the Agreement and the Letter which you hereby acknowledge as a debt (the "Debt"). You also acknowledge your liability to repay the Debt which is payable by you on demand by us. In the event that you do not pay the Debt to us in full within one hundred and twenty days of receipt of our demand, we reserve the right and you authorise us to sell the Property without notice and to deduct the Debt, commissions and any sale expenses from the sale proceeds and we will remit any excess to you.

5.2 You agree that no agency will arise should we sell the Property in the exercise of our lien and that you authorise us to sell the Property in whatever manner we consider reasonably appropriate. If the Debt and any related expenses exceed the sale proceeds the balance will remain due to us.

6.  Governing Law

This Agreement and the Letter shall be governed by and construed in accordance with the laws of England and Wales. In the event of any dispute hereunder, the parties hereby consent to the exclusive jurisdiction of the courts of England and Wales.

7.  Miscellaneous

This Agreement and the Letter shall be binding upon our and your legal representatives, successors and assigns.

If any part of this Agreement is found by any court to be invalid, illegal or unenforceable, that part may be discounted and the rest of the agreement shall continue to be valid and enforceable to the fullest extent permitted by law.

The parties agree to the foregoing by signing in the space provided below.

John Corti Emmerson

Date 16.01.2013

Anne Emmerson

Date 16.01.2013

Timothy Sammons Ltd

Date 23.1.2013

## SCHEDULE 1

| | DESCRIPTION | Range of Value £ | Method of Sale |
|---|---|---|---|
| | Attributed to Giovanni Battista Piazzetta<br>HEAD OF A BOY<br>Chalk and gray wash on paper<br>*15.5 x 10.8 in  (40 x 27.5 cm)*<br>Stamped in the lower right corner | 800 -1,200 | Private/<br>Auction |
| | Attributed to James Ward<br>SEATED BOY<br>Black, red, white chalk and pencil on paper<br>*12 x 9.5 in (30.5 x 24 cm)*<br>Singed in the lower right corner | 800 -1,200 | Private/<br>Auction |
| | Attributed  to Danielle Ricciarelli  'da Volterra'<br>STUDY OF FEET<br>Pen and ink pencil and wash on paper<br>*8 x 11.5 in  (20.3 x 29 cm)*<br>Stamped in the lower right corner | 1,000 -1,500 | Private/<br>Auction |
| | Attributed to Carlo Maratta<br>SMALL CUPID<br>Red chalk on paper<br>*7.5 x 5 in  (19 x 12.7 cm)*<br>Stamped in the lower right corner | 2,000 – 3,000 | Private/<br>Auction |
| | Attributed to Pietro da Cortona<br>YOUNG WOMAN HOLDING GLOBE<br>Red chalk on paper<br>*9.5 x 8.6 in (24 x 22 cm)*<br>Signed in the lower left corner and in the top left corner | 15,000 – 20,000 | Private/<br>Auction |
| | Attributed to Bartolomeo Schedoni<br>HEAD OF A BOY<br>Red chalk on paper<br>*11.8 x 9.2 in  (30 x 23.5cm)*<br>Stamped in the lower right corner | 1,500 - 2,000 | Private/<br>Auction |

7.

Milanese School 17th Century
DRAPERY STUDY: FEMALE RUNNING FIGURE        12,000 – 18,000        Private/
Pencil with gray wash heightened with white on paper                          Auction
12.2 x 9in   (31 x 23cm)


Attributed to Sir Edward Burne – Jones, R.A.          8,000 – 12,000        Private/
Standing classical female figure                                              Auction
1896
Gold point drawing
13.7 x 9 in  (35 x 22.8 cm)
Singed and dated in the lower left corner; letter on
reverse of the drawing


17TH century school of Parma              6,000 – 8,000         Private/
TWO HEADS                                                                    Auction
MEDIUM: Red chalk on paper
4.5 x 6 in  (11.5 x 15.2 cm)
Signed in the lower left corner and stamped in the
lower right corner


John Vanderlyn                                       3,000 – 4,000         Private/
ARCH OF TITUS                                                                Auction
Watercolour on paper
38.5 x  25.3 in  (98 x 64.5 cm)


Joachim Anthonisz Wtewael                          300,000 – 500,000       Private/
CARITAS                                                                      Auction
c. 1620-1628
Oil on panel
15.1 x 23.2 in (38.4 x 59 cm)


A George III Satinwood Pembroke table               3,000 – 5,000         Private/
Height: 26.7 in (68 cm); Width: 38.9 in (99cm); Depth:                      Auction
29.5 in (75 cm)

A George III satinwood Chiffonier
Height: 35.4 in (90 cm) ; Width: 43.1 in (109.5 cm);    2,000 – 3,000      Private/
Depth: 17.5 in (44.5 cm)                                                    Auction


Chinese Altar table
Height: 30.7 in (78 cm); Width: 46.8 in (119 cm); Depth:   1,000 - 1,500   Private/
13.2 in (33.6 cm)                                                           Auction

| | | |
|---|---|---|
| Three silver-gilt wine coasters, London, each engraved with a crest below an earl's coronet (3) | 1,200 – 1,800 | Auction |
| A pair of silver-gilt casters, London (2) | 1,500 - 2,000 | Auction |
| A silver snuffbox, Birmingham | 70 – 100 | Auction |
| A mother of pearl snuffbox, the cover carved with a battle scene, in a leather case | 500 – 800 | Auction |
| An enamel snuffbox the cover decorated with flowers | 500 - 800 | Auction |
| A two-handled silver tray, Sheffield | 1,500 – 2,500 | Auction |
| Six French dessert plates, each painted with fish with gilt borders, Limoges, 1900 (6) | 400 – 600 | Auction |
| Two George IV silver meat trays | 2,500 – 3,500 | Auction |
| Silver three piece Tea set, crested by Paul Storr (3) | 2,000 – 3,000 | Auction |
| A lorgnette | 800 – 1,200 | Auction |
| Four silver-gilt fruit plates, Heaton & Roscoe, (4) | 2,000 – 3,000 | Auction |
| A triple-strand pearl necklace with diamond clasp | [ ] | |
| A silver salver on four feet, crested, Burwash & Sibley | 2,000 – 3,000 | Auction |

JCE/PRE
Keep.

## SCHEDULE 2

Mr & Mrs John Emmerson
Court Farmhouse,
Wylye,
Wiltshire,
BA12 0RF

[ Date ]

Dear John and Anne

The items listed in Schedule 1 of the Agreement (the "Property")

You agree to consign the Property to us for sale as set out in Schedule 1, which sets out the ranges of value and the methods of sale for each item.

We will act as your exclusive agent and on the sale of each item of the Property we will:

1.    charge you a commission of 10% (plus VAT) on the price achieved

2.    charge you [0.5/0.75]% (plus VAT) on the sale price of the Property for the assumption of risk of loss or damage to the Property while it has been under our control.

3.    deduct the agreed expenses to date and any other agreed expenses from the proceeds of sale of the Property

If any item of the Property remains unsold you agree to repay all expenses due under the Agreement and this Letter including insurance on the mid range of value of the Property as set out in Schedule 1 and we will return the Property once we have received payment in full in accordance with our terms.

In order to fulfill our role to the best of our ability and to execute the sales plan, we will need the authority provided by our exclusive appointment for this purpose.

If you are happy with this, I would ask you to sign the Agreement, which provides us with the required authority to proceed.

With best wishes

Yours sincerely


Charles Cochrane

EXHIBIT B

# LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (as amended, modified, supplemented or restated, this "Agreement"), dated as of June 9, 2014 is by and among Timothy Sammons Inc., a New York company, with its principal place of business at 19 East 66th Street, New York, New York 10065, and Timothy Sammons, an individual, with an office at19 East 66th Street, New York, NY 10065, jointly and severally (individually a "Borrower" and collectively the "Borrowers"), and Knickerbocker Funding LLC, a Delaware limited liability company, having offices at 41 East 57th Street, New York, New York, 10022 (the "Lender").

WHEREAS, Borrowers have requested Lender to extend credit to them for which they will be liable, jointly and severally, in an aggregate principal amount not to exceed Six Hundred Thousand Dollars and 00/100 (US$600,000.00) (the "Loan") and interest charges and fees thereon (the "Loan Amount"); and

WHEREAS, Lender is willing to extend such credit to Borrowers provided that Borrowers comply with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the promises, covenants and undertakings set forth herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Lender and Borrowers, jointly and severally, agree as follows:

1.     Definitions.  For purposes of this Agreement, all capitalized terms shall have the meanings set forth herein, including the following defined terms:

(a)     Affiliate of Lender:  A person or entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with the Lender.

(b)     Collateral:  Collectively, all of the following, whether now owned or hereafter acquired by Borrowers: (1) the original works of art and/or other assets listed in Exhibit A hereto, and all additions or replacements thereto (the "Property"), (2) all Borrowers' rights, interests, royalties, licenses, rental agreements, supporting agreements and general intangibles relating to the Property, (3) all proceeds of sale, exchange or other disposition of the Property and insurance proceeds of the Property, or any part thereof, and (4) all monies or credits relating to the Property due to Borrowers.

(c)     Indebtedness:  The principal of, interest on, all fees and all other amounts, payments, and premiums due and/or to become due under the Loan, the Promissory Note, the Origination Agreement, this Agreement and all Other Agreements.

(d)     Fair Market Value of the Collateral:  The fair market value of the Collateral shall be determined by the mutual agreement of Borrowers and Lender, or if no such value can be agreed upon, then by appraisal by a third party acceptable to Lender in its sole discretion.  All costs and expenses of such third-party appraisal shall be paid by the Borrowers on demand and shall constitute Obligations secured hereby.

(e)    <u>Loan</u>:  The lending of the Loan Amount by Lender to Borrowers pursuant to the terms and conditions of this Agreement, including any amendments, modifications, renewals, increases and extensions thereof.

(f)    <u>Obligations</u>:  Any and all of the covenants, promises and other obligations, indebtedness or liabilities of every kind, nature and description, direct or indirect, secured or unsecured, absolute or contingent, due or to become due, made or owing by Borrowers to Lender or any Affiliate of Lender, under (i) the Loan, this Agreement, the Promissory Note or the Origination Agreement (including any amendments, modifications or renewals of any of the foregoing) and (ii) any other promissory note, loan or other agreement (including any amendments, modifications, or renewals of any of the foregoing), regardless of the source or nature of the underlying transaction among Borrowers and Lender and any bailment or agreement entered into by and among Borrowers, Lender and any art house, gallery or warehouse with respect to the Property or for the benefit of the Lender (hereinafter, those agreements set forth in immediately preceding clause (ii) shall be referred to collectively as the "Other Agreements").

(g)    <u>Origination Agreement</u>:  That certain Origination Agreement of even date herewith by and among Originator (a separate legal entity), and Borrowers, as amended, modified, supplemented or restated.

(h)    <u>Other Agreements</u>:    Such term is defined in the defined term "Obligations."

(i)    <u>Principal Balance</u>:  The total amount advanced by Lender to Borrowers (prior to the deduction for prepaid interest, expenses and fees) and the balance outstanding after any repayments by Borrowers of principal thereafter.

(j)    <u>Promissory Note</u>:  That certain Secured Grid Promissory Note of even date herewith made by the Borrowers payable to the Lender in the principal amount of $600,000, as amended, modified, supplemented or restated.

2.    <u>The Loan</u>.

(a)    <u>Loan</u>:  Subject to the terms and conditions of this Agreement, Borrowers may request that Lender make a portion of the Loan available to Borrowers and Lender agrees to make such portion of the Loan available to Borrowers, in its sole discretion, whether or not Borrowers are in compliance with this Agreement, (each such portion of the Loan so advanced, an "Advance") and upon receipt by Lender of a written notice from Borrowers (each such notice, an "Advance Notice") (i) setting forth the amount of Loans to be received pursuant to such Advance Notice, and (ii) stating the date such Advance is to be made (which date shall be at least three (3) business days after the day Lender receives such Advance Notice (the "Borrowing Date") (provided, however, such Advance Notice request will be waived with respect to the Advance on the closing date).  The first advance of the Loan Amount on the closing date shall be in the amount of $550,000 <u>less</u> (a) origination fees as provided in the Origination Agreement, (b) twelve (12) months of prepaid interest on the Loan, (c) transaction expenses relating to this Agreement and (d) Lender's good faith estimate for storage costs for the Property for the first

year following the closing date.  The advance of the Loan Amounts (other than the Advance on the closing date) shall be further subject to receipt of such other Collateral as may be acceptable to the Lender.  Subject to the foregoing, Lender will advance the Loan Amounts to Borrowers, for which Borrowers shall be liable, jointly and severally, provided, that as of the date of such advance:  (1) since the date of the most recent statements of net worth Borrowers have provided to Lender, no material adverse change in the financial condition or creditworthiness of Borrowers has occurred and if requested, Borrowers shall provide to Lender updated statements of net worth; (2) all representations and warranties of Borrowers in this Agreement are true and correct; (3) no Event of Default (as defined in Paragraph 7 below) or other event that with the passage of time or giving of notice would constitute an Event of Default has occurred, (4) Borrowers have executed and delivered to Lender the Promissory Note, the Origination Agreement and all Other Agreements, and all other information, documents and/or agreements requested by Lender, (5) Lender shall have received satisfactory evidence that UCC Financing Statements with respect to the Collateral has been filed in such jurisdictions as Lender deems necessary or appropriate, (6) Lender shall have received the results of UCC, tax lien and judgment searches recently performed against Borrowers and all such results shall be satisfactory to Lender in its sole discretion, (7) Lender shall have received evidence of insurance binders for insurance in form and substance acceptable to Lender (including evidence that such policies have been paid through the Maturity Date), in accordance with Section 6(c) of this Agreement, (8) Borrowers shall have complied with and continue to be in compliance with all provisions of the Other Agreements, (9) Lender shall have received such warehouse or bailee agreements from all persons in possession or control of the Property, in form and substance satisfactory to Lender, as Lender deems necessary or appropriate, (10) in Lender's discretion, no material adverse change shall have occurred in the market for works of art in the nature of the Property and (11) the Property shall be in the same or better condition as the condition thereof at the time of its most recent appraisal as provided to Lender, without material change or damage thereto.

(b)    Interest.  Borrowers will pay Lender interest on the outstanding Principal Balance of the Loan at a rate equal to fourteen percent (14%) per annum, calculated based on the actual number of days elapsed over a year of 360 days, but in no event at a rate of interest greater than that permitted by applicable law.

(c)    Interest Payment and Repayment.  Borrowers shall pay to Lender, or order, interest on the outstanding principal amount of the Loan at the applicable interest rate set forth in the Promissory Note for six months in advance (the "Interest Payments"), beginning on the closing date and then continuing every three months in advance thereafter, if extended in Lender's sole discretion, and the total Loan Amount shall be due and payable on the Maturity Date set forth in the Promissory Note.  All payments will be applied first to accrued interest, unpaid fees and expenses, and then to the Principal Balance of the Loan.

(d)    Prepayment.  Upon three (3) business day's prior written notice to Lender, Borrowers may prepay the Loan in whole or in part in amounts of at least Fifty Thousand Dollars ($50,000) at any time during the term hereof or such lesser amount as shall be necessary to repay the Loan in full. The Loan will be without prepayment premium or penalty.  Amounts of the Loan repaid may be reborrowed at Lender's sold discretion. **There will be not credit for prepaid interest for the initial six month term.**

(e)    <u>Default Interest</u>.  If interest is not paid within five (5) days of when due, or an event of default has occurred, or the unpaid Principal Balance is not paid on the Maturity Date and the Loan has not been extended pursuant to Paragraph 3(b) hereof, Borrower shall pay Lender default interest equal to the applicable interest rate <u>plus</u> eight percent (8%), as well as any unpaid interest or other Obligations, in each case, for the period commencing on the due date and accruing until the date of actual payment, based on the actual number of days elapsed over a year of 360 days compounded daily or the maximum amount permitted by law, whichever is less.

3.    (a)    <u>Term and Termination</u>.  Subject to the right of Lender to terminate this Agreement under Paragraph 7 upon the occurrence of an Event of a Default, the term of this Agreement shall commence on the date hereof and shall continue for one year provided, however, that the terms and conditions of this Agreement and the Obligations and Indebtedness arising prior to its termination shall remain in effect until all Indebtedness has been paid in full and the Obligations have been fully performed.

(b)    <u>Maturity Extension</u>.  Upon written notice to Lender at least thirty (30) days prior to the Maturity Date, which notice must be accompanied by the payment of a loan extension fee to Originator as set forth in the Origination Agreement and prepaid interest for the extended quarter, and provided further that no Event of Default shall have occurred and be continuing as of the date of such notice and the date of such extension, the Maturity Date of the Loan shall be extended for up to two (2) extensions of three (3) months each.

4.    <u>Security</u>.  As security for the payment of the Indebtedness and the performance of the Obligations, Borrowers grant to Lender a first priority security interest in the Property and Collateral.

5.    <u>Representations and Warranties</u>.  In order to induce Lender to enter into this Agreement and to make the Loan to Borrowers, Borrowers represent and warrant to Lender as of the date hereof and as of each day when any Loan is outstanding that:

(a)    <u>Location of Property</u>.  Except as permitted by Sections 6(i) and (j) hereof, all Property is, and at all times shall be, located as set forth on <u>Exhibit A</u>.

(b)    <u>Authenticity</u>.  All Property is authentic and is a work of art by the person described on Exhibit A as the creator.  No Property is subject to any agreements, with the artist or creator thereof or otherwise, regarding royalty on resales, restrictions on dispositions, or any other matter that may restrict the Lender's rights to sell or dispose of such Property.

(c)    <u>Ownership</u>.  The Borrowers own the Property free and clear of any lien, security interest, charge or encumbrance or interest of any other person (including, without limitation, any interest as consignor) except for the security interest created by this Agreement or as may be created pursuant to any Other Agreement to which Lender is a party.  No financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office, except such as my have been filed in favor of the Lender relating to this Agreement.  Each Borrower has filed all federal, state and local tax returns and other reports it is required by law to file and has paid, to the extent due and payable, all taxes, levies, assessments, charges, liens, claims or encumbrances upon or relating to the Collateral.

(d)     <u>Cultural Protection Laws</u>.  No Property is subject to any national cultural protection law of any jurisdiction which could in any manner restrict the Lender's rights to sell or dispose of such Property.

(e)     <u>Lender's Liens</u>.  This Agreement creates a valid security interest in the Collateral and, upon proper filing of UCC financing statements, will give the Lender a perfected first priority security interest in all the Collateral, securing the payment of the Obligations.

(f)     <u>Validity of Agreement</u>.  Borrowers have the full legal capacity and right to borrow money from, and pledge its assets to, Lender and to execute and perform this Agreement, the Promissory Note, the Origination Agreement and all Other Agreements.  Each of this Agreement, the Promissory Note, the Origination Agreement and all Other Agreements is legally valid and enforceable against Borrowers in accordance with its terms and conditions, and will not violate any requirement of law applicable to Borrowers or any contract, agreement or instrument to which Borrowers are a party or by which Borrowers or their property is bound, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Borrowers, except as contemplated by this Agreement and any Other Agreements to which Lender is a party.  No consent, approval of, license, permit, authorization, notice or report to, registration, filing or declaration with any person or entity or governmental authority is required in connection with the execution, delivery and performance of this Agreement, the Promissory Note, the Origination Agreement and all Other Agreements, or any of the transactions contemplated thereby.

(g)     <u>Financial Information</u>.  All statements of net worth, tax returns and other financial data that have been given to Lender by or on behalf of Borrowers (the "Financial Information") are complete and correct in all material respects, accurately present the financial condition of Borrowers as of the dates, and for the periods specified in the Financial Information.  There has been no change in the assets, liabilities or financial condition of Borrowers from that set forth in the Financial Information other than changes in the ordinary course of affairs, none of which changes has been materially adverse to Borrowers.

(h)     <u>Litigation</u>.  Except as specifically disclosed to Lender in the Financial Information, there is not now pending against Borrowers, nor to the knowledge of Borrowers is there threatened, any action, suit or proceeding at law or in equity or before any governmental or administrative agency (i) with respect to this Agreement, the Promissory Note, the Origination Agreement or any Property or (ii) that could have a material adverse effect upon Borrowers' financial condition or ownership of the Property if adversely determined.  No judgment, decree or order of any court or governmental or administrative agency or instrumentality has been issued against Borrowers which has or may have any material adverse effect on the financial condition of Borrowers.

(i)     <u>Taxes</u>.  Borrowers have filed all federal, state, county, municipal and other income tax returns required to have been filed by them and have paid all taxes which have become due pursuant to such returns or pursuant to any assessment received by them (except for such taxes and assessments which Borrowers are contesting in good faith), and Borrowers know of no basis for additional material assessment in respect of such taxes.

(j)     <u>Consumer Transaction</u>.  The security interest granted in this Agreement does not secure a consumer credit transaction as defined in the Consumer Credit Protection Act and Federal Reserve Board Regulation Z and does not apply to household goods of Borrowers or Borrowers' dependents as defined in Federal Reserve Board Regulation AA.

6.     <u>Covenants</u>.  Until the entire Indebtedness shall have been paid in full and the Obligations fully performed, Borrowers hereby covenant and agree as follows:

(a)     <u>Compliance with Laws</u>.  Borrowers shall, in all material respects, comply with, conform to and obey all present and future laws, ordinances, rules, regulations, orders and requirements of public authorities, which may be applicable to them.

(b)     <u>Books and Records</u>.  Borrowers shall maintain full and complete records reflecting Borrowers' financial conditions.

(c)     <u>Insurance</u>.  Borrowers will insure their property, including the Property, against loss by fire and other hazards, theft, casualties and contingencies and will also maintain liability insurance covering bodily injury or property damage.  The insurance covering the Collateral will be in amount (not less than appraisal value), from and with an insurer and with such terms and endorsements acceptable to Lender and will name Lender as an additional insured and loss payee. The insurance covering the Collateral shall provide (i) that all proceeds thereunder shall be payable solely to Lender, (ii) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (iii) that such policy or additional insured may not be cancelled, amended or terminated unless at least thirty (30) days prior written notice is given to Lender.  The premium(s) on the insurance of the collateral shall be paid in full for a term ending on a date at least co-extensive with the Maturity Date.  To the extent that Lender receives any insurance proceeds with respect to the Collateral, such proceeds shall be applied in the following order:

(i)     to repay any outstanding fees and accrued interest;

(ii)     to pay down the then outstanding principal of the Loan, but only to the extent that, giving effect to the loss of the Collateral and such repayment, the then outstanding principal amount of the Loan shall not exceed forty percent (40%) of the Fair Market Value of the Collateral.

(d)     <u>Storage Matters</u>.  Subject to Sections 6(i) and (j) hereof, all Property shall be stored and maintained at storage facilities selected by Lender under accounts in the name of Lender.  Borrowers shall pay any and all shipping and storage facility costs with respect to the Property during the period commencing the date hereof and continuing while the Indebtedness continues to be outstanding and shall deliver to Lender evidence of all such properties.

(e)     <u>Periodic Financial Statements</u>.  Borrowers shall furnish to Lender the following financial information in such detail as Lender may reasonably request:

(i)     within thirty (30) days after the end of each quarter, a statement of net worth of Borrowers prepared as of the end of such quarter, which statement shall be prepared in accordance with accounting principles consistent with those reflected in the Financial

Statements of Borrowers submitted to Lender in connection with the application for the Loan; and

(ii)    within thirty (30) days after their filing due date, copies of Borrowers' federal income tax returns.

(f)    <u>Actions, Claims, etc</u>.    Borrowers shall promptly defend any action, proceeding or claims affecting Borrowers, the Collateral or its other property and shall promptly notify Lender of the institution of any such action, proceeding or claim if the same could have a material adverse effect upon the financial condition of Borrowers or Borrowers ownership of the Property if adversely determined.  Borrowers also shall promptly notify Lender of the occurrence of any other event, the effect or outcome of which could have such a material adverse effect.

(g)    <u>Taxes</u>.    Borrowers shall pay, as and when the same shall become due and payable, all taxes, assessments, fees and charges of any kind whatsoever imposed upon Borrowers or their property, and all claims which constitute, or if unpaid may become, a lien upon the Property, except for such taxes, assessments, fees and charges as to which Borrowers are contesting its liability therefor in good faith and all actions to seize or distrain Borrowers' property, including the Property, have been stayed.

(h)    <u>Inspection</u>.    As often as Lender may reasonably request, Borrowers shall permit any person designated by Lender, at reasonable times during normal business hours, to inspect the Property and all books and records relating thereto and make copies thereof.

(i)    <u>Collateral Condition and Location</u>.    Borrowers will take such steps as are necessary to ensure that Lender's security interest is perfected with respect to each item of the Collateral and that such security interests are of record in all appropriate jurisdictions as first liens at the time the Loan is funded.  Borrowers shall timely supply Lender with evidence of the satisfaction of such requirements.  Borrowers will not remove any item of Collateral from the location(s) indicated in Exhibit A without Lender's prior written consent, which consent may be withheld or conditioned at Lender's sole discretion.  Borrowers will keep the Collateral secured, in good condition, make all necessary repairs, use their best efforts to prevent any act which might impair the value of the Collateral and will defend Lender's security interest in the Collateral.  Borrowers will not change their principal place of business or residence, as the case may be, without thirty (30) days prior written notice to Lender.   Upon Lender's request, Borrowers will attach to their records a notation satisfactory to the Lender of the Lender's security interest in the Collateral.  Borrowers will not, and will not permit any third party to, reframe, restore or repair any Property without the prior written consent of Lender, which consent may be withheld or conditioned at Lender's sole discretion.

(j)    <u>Possession by Third Parties</u>.    Subject to the provisions of subsection (i) above, Borrowers will cause any third party in possession of any item of Collateral to execute and deliver to Lender such warehouse or bailment agreements as shall be satisfactory to Lender in its sole discretion.

(k)    <u>Transfers</u>.    Borrowers will not, without Lender's prior written consent, sell, transfer or otherwise dispose of any of Borrowers' interest in this Agreement or the

Collateral, which consent may be withheld or conditioned at Lender's sole discretion. Subject to Lender's prior written consent, which consent shall not be unreasonably withheld, Borrowers may market any of the Collateral during the term of the Loan and upon Lender's prior written consent regarding the purchase price and other terms of any sale of the Collateral, may sell the Collateral on terms as consented to by Lender. Upon a sale of all or any portion of the Collateral so approved by Lender during the term of the Loan and Lender's receipt of gross proceeds from such sale, Lender agrees to release its liens on such Collateral. Borrowers shall use their best efforts to keep Lender apprised of any marketing efforts undertaken to sell any of the Collateral and shall use reasonable business judgment when marketing any Collateral to avoid activities that may negatively affect the value of such Collateral. Sales proceeds from the sale of any Collateral shall be directed first to satisfy certain fees and expenses related to the sale of Collateral, if any, next any fees owed to Lender or Originator relating to such sales, next to reduce and/or repay any accrued interest if any, then to reduce the balance of the principal indebtedness and the balance shall be applied to satisfy any remaining Obligations. All remaining net proceeds, if any, shall be paid to Borrowers.

(l)    Further Security Interests.  Borrowers will not grant or permit any security interest in or permit any liens upon the Property other than in favor of Lender or pursuant to any Other Agreement to which Lender is a party without the prior written consent of Lender, which consent may be withheld or conditioned in Lender's sole discretion.

7.    Events of Default and Remedies.

(a)    Event of Default:  The term "Events of Default" shall mean the occurrence or happening, from time to time, of any one or more of the following:

(i)    Payment of Interest and Principal.  If Borrowers default in the due and punctual payment of (i) any Interest Payment within five (5) days of when the same shall become due and payable or (ii) the Principal Balance when the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment or by acceleration or otherwise.

(ii)    Performance of Covenants and Obligations.  If Borrowers default in the due observance or performance of any of the Covenants and Obligations referred to herein (other than as referred to in Sections 7(a)(i) and (iii)  hereof) and such default shall not be curable, or if curable shall continue for five (5) days.

(iii)    Covenants and Obligations in Section 6.  If Borrowers default in the due observance or performance of any of the Covenants and Obligations contained in Section 6 of this Agreement.

(iv)    Bankruptcy, Receivership, Insolvency, Etc.  If Borrowers shall: apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, administrative receiver, trustee, administrative custodian, liquidator or similar fiduciary of the Borrowers or all or substantially all of their property; commence a voluntary case under any federal, state or other bankruptcy law or similar laws of any foreign jurisdiction; be adjudicated a bankrupt or insolvent; make a general assignment for the benefit of creditors; file a petition

seeking to take advantage of any other law providing for relief to debtors; or fail to have dismissed within forty-five (45) days, any petition filed against it in any voluntary case under any bankruptcy or similar laws.

(v)     <u>False Representation</u>.  If any representation or warranty made by Borrowers in, under or pursuant to this Agreement, the Origination Agreement, any Other Agreement between Borrowers and Lender or any Affiliate of Lender, and/or any report, certificate, financial statement or other statement furnished by or on behalf of Borrowers to Lender or to any insurer of any Property, shall prove to have been false or misleading in any material respect as of the date on which such representation or warranty was made or furnished.

(vi)     <u>Default under Other Indebtedness</u>.  If Borrowers default under any other indebtedness in the individual or aggregate amount of $100,000 or more.

(vii)     <u>Material Adverse Change</u>.   If there shall occur any material adverse change in the condition and/or affairs of any Borrower which in Lender's sole determination would impair the full and timely payment of the Indebtedness.

(viii)     <u>Death or Incapacity of Borrower</u>.  If any Borrower or Guarantor shall die or become permanently incapacitated.

(b)     <u>Remedies</u>.  If an Event of Default shall occur, Lender may exercise any one or more of the remedies set forth below, in its sole discretion:

(i)     <u>Acceleration</u>.   Lender may declare the unpaid portion of the Indebtedness to be immediately due and payable, without further notice or demand, whereupon the same shall become due and payable and Lender's undertaking to make further advances hereunder shall terminate.

(ii)     <u>Exercise Right of Offset</u>.   Lender may offset and apply, in Lender's sole discretion, any monies, credits or other proceeds or property of Borrowers that have or may come into the possession or under the control of Lender against the Indebtedness. Lender may convert any such proceeds or property to cash in a commercially acceptable manner and deduct from the amount applied as an offset to the Indebtedness the reasonable and necessary cost of converting such proceeds or property to cash.

(iii)     <u>Repossess the Collateral</u>.   Lender, personally, or by agents or attorneys, may enter upon any premises where the Property may be, may repossess the Property and upon not less than ten (10) days prior written notice, may sell the Collateral at public or private sale, subject to the restrictions described herein, or otherwise dispose of the Collateral and apply the proceeds, less all expenses including, without limitation, attorney's fees, to the repayment of the Indebtedness, or any amounts due or other obligations under any of the Other Agreements, as Lender elects. At the request of Lender, Borrowers shall assemble such Property and make it available to Lender at such place or places as Lender may reasonably request.  Such repossession shall not affect the right of Lender to retain prior payments.  Borrowers shall pay Lender any balance of the Indebtedness then due and owing after such sale or other disposition, and Lender shall account to Borrowers for any excess amount over the Indebtedness and the expenses of sale and repossession.

(iv)    <u>Exercise Other Remedies</u>.    Lender may exercise any remedy specifically granted to a secured party under the Uniform Commercial Code or now or hereafter existing in equity, at law, by virtue of statute or otherwise, and may resort to any other security for the Loan in such order and manner as Lender may elect.

(c)    <u>Cumulative Remedies</u>.    The rights and remedies of Lender as provided in this Agreement shall be cumulative and in addition to any other right, remedy or power herein specifically granted or now or hereafter existing in equity, at law, by virtue of statute or otherwise, and may be pursued separately, successively, concurrently, independently or together against Borrowers or against the Collateral, at the sole discretion of Lender, and may be exercised as often as occasion therefor shall arise.    The failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof, nor shall the choice of one remedy be deemed an election of remedies to the exclusion of other remedies.    Acceptance of payments in arrears shall not waive or affect any Lender's right with respect to any other payment or default or Lender's right to accelerate the Indebtedness as herein provided.  Lender's waiver or agreement with respect to any past due payment, Event of Default or any other event shall not alter or affect Borrowers' obligations or Lender's rights with respect to any other payment, Event of Default or event.

(d)    <u>Waiver</u>.    Each Borrower waives presentment for payment, demand, notice of demand, notice of nonpayment or dishonor, protest and notice of protest of any amounts due under this Agreement and the Loan, and all other notices in connection with the delivery, acceptance, performance, default, or enforcement of the payment of the amounts due under this Agreement and the Loan.  Each Borrower waives (to the extent that the same may be waived) the benefit of all valuation, appraisement, exemption, stay of execution and redemption laws now or hereafter in effect.

(e)    **WAIVER OF RIGHT TO TRIAL BY JURY.  TO FACILITATE EACH PARTY'S DESIRE TO RESOLVE DISPUTES IN AN EFFICIENT AND ECONOMICAL MANNER, EACH PARTY TO THIS AGREEMENT EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT, THE ORIGINATION AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT, THE ORIGINATION AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE LOAN, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER ARISING IN CONTRACT OR TORT OR OTHERWISE.  EACH PARTY AGREES THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.**

8.    <u>Miscellaneous</u>.

(a)    <u>Further Assurances</u>.  Borrowers, upon the reasonable request of Lender, will, at their own cost and expense, execute, acknowledge and deliver such further instruments (including, financing statements, estoppel certificates and declarations of no set-off) and do such further acts as may be necessary, desirable or proper to carry out more effectively the purpose of this Agreement, to facilitate the assignment or transfer of this Agreement, and to subject the Collateral to the security interests and assignments as Lender elects.

(b)    <u>Notices</u>.    All notices, demands, requests and other communications required under this Agreement shall be in writing and shall be deemed to have been properly given if sent by: (1) U.S. registered or certified mail, postage prepaid, return receipt requested, in which event the same shall be deemed to have been received on the date indicated by the return receipt; or (2) overnight carrier (i.e. Federal Express or UPS), in which event the same shall be deemed to have been received on the day following delivery to the overnight carrier; or (3) by telefax transmission, in which event the same shall be deemed to have been received on the day of transmission, addressed to the party for whom it is intended at the addresses or telefax numbers set forth below each party's signature, as the case may be.  Any party may designate a change of address by written notice to the other, in like fashion, given at least ten business days before such change of address is to become effective.

(c)    <u>Lender's Right to Perform the Obligations</u>.    Time is of the essence.  If Borrowers shall fail to make any payment or perform any act required by this Agreement, then Lender, upon lapse of any grace or notice periods and without further notice to or demand upon Borrowers and without waiving or releasing any obligation or default, may make such payment or perform such act for the account of and at the expense of Borrowers, as Lender elects.  All reasonable and necessary sums so paid by Lender, and all costs and expenses, including, without limitation, reasonable attorneys' fees and expenses so incurred, together with interest thereon, shall constitute additions to the Indebtedness secured by this Agreement, and shall be paid by Borrowers to Lender, on demand.

(d)    <u>Severability</u>.  If any provision of this Agreement is prohibited by, or is unlawful or unenforceable under, or any one or more  of the Obligations is invalid, illegal or unenforceable in any respect under, any applicable law of any jurisdiction, such provision or Obligation shall, as to such jurisdiction, be ineffective to the extent of such prohibition without invalidating the remaining provisions of this Agreement; provided, however, that any such prohibition in any jurisdiction shall not invalidate such provision in any other jurisdiction; and provided, further, that where the provisions of any such applicable law may be waived, they hereby are waived by each Borrower to the full extent permitted by law to the end that this Agreement shall be deemed to be valid and binding in accordance with its terms.

(e)    <u>Modification</u>.  The terms and conditions of this Agreement may not be changed, waived, discharged or terminated except by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is asserted, and then such modification, waiver or consent shall be effective only in the specific instance and for the specific purpose given.  Any notice to or demand on Borrowers in any event not specifically required of Lender hereunder shall not entitle Borrowers to any other or further notice or demand in the same, similar or other circumstances unless specifically required hereunder.

NGEDOCS: 1663724.2                                      11

(f)     <u>Survival of Warranties and Covenants</u>.  The warranties, representations, covenants and agreements set forth in this Agreement shall survive the making of the Loan and the execution and delivery of this Agreement, and shall continue in full force and effect until the Indebtedness shall have been paid in full.

(g)     <u>Loan Expenses</u>.  Borrowers shall pay on demand all costs and expenses in connection with (i) the preparation of the agreements and instruments executed in connection herewith and in connection with any applicable Other Agreements (including any amendment or modification), including without limitation reasonable fees and disbursements of Lender's counsel and costs of lien searches, recording costs and expenses and shall also pay costs incurred by Lender in connection with shipment and appraisal of the Property prior to the date hereof (whether by third parties or Lender personnel) in an aggregate amount not to exceed Ten Thousand Dollars ($10,000), which amounts will be the netted from the amount of the Loan Amount advanced on the closing date, and (ii) all costs and expenses, including reasonable costs and expenses of Lender's counsel incurred by Lender in connection with the enforcement of this Agreement, the Promissory Note, or the Origination Agreement and the collection of the Obligations.

(h)     <u>Headings, Etc</u>.  The article headings and the section and subsection captions are inserted for convenience or reference only and shall in no way alter or modify the text of such articles, sections and subsection.  All references herein to articles, sections, sub-sections, paragraphs, clauses and other subdivisions refer to the corresponding articles, sections, sub-sections, paragraphs, clauses and other subdivisions of this Agreement; and the words "herein", "hereof", "hereto", "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular article, section, sub-section, paragraph, clause or other subdivision hereof.  Whenever used, the singular number shall include the plural, the plural shall include the singular.

(i)     <u>Binding Effect; No Release</u>.  This Agreement shall be binding upon, and shall inure to the benefit of, the successors and assigns of Borrowers and Lender.  No transfer, renewal, extension or assignment of this Agreement or any interest hereunder, nor any transfer, loss or damage of the Collateral shall release Borrowers from their obligations under this Agreement.

(j)     <u>No Representations by Lender</u>.  By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Agreement, including without limitation any insurance policy, financial statement or agreement, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of such document, or of any term, provisions or condition thereof.

(k)     <u>Entire Agreement</u>.  This Agreement and the other documents executed by Borrowers and/or Lender in connection with this Agreement constitute the sole and entire agreement of the parties with respect to the subject matter hereof.

(l)     <u>Assignment</u>.  Borrowers may not assign this Agreement or any right hereunder, in whole or in part, without the prior written consent of Lender, which consent shall not be unreasonably withheld, delayed or denied.  Lender may, at any time, without notice to

Borrowers, grant a security interest in or otherwise transfer, sell or assign all or any part of its interest in this Agreement, the Promissory Note or amounts due or to become due hereunder, subject to Borrowers' rights under the terms and conditions of this Agreement and the Promissory Note.

(m)    <u>Jurisdiction and Venue</u>.  This Agreement shall be deemed to have been made and delivered in the State of New York and shall be governed as to validity, interpretation, construction, effect and in all other respects by the internal laws of the State of New York other than with respect to the perfection and the effect of perfection of Lender's security interest in the Collateral which shall be governed by the applicable choice of law provisions of the Uniform Commercial Code as in effect in the State of New York. The Borrowers (l) agree that any legal suit, action or proceeding arising out of or relating to this Agreement shall be instituted exclusively in New York State Supreme Court, County of New York, or in the United States District Court for the Southern District of New York, (2) waive any objection which the Borrowers may have now or hereafter to the venue of any such suit, action or proceeding, and (3) irrevocably consent to the jurisdiction of the New York State Supreme Court, County of New York, and the United States District Court for the Southern District of New York in any such suit, action or proceeding.  The Borrowers further agree to accept and acknowledge service of any and all process which may be served in any such suit, action or proceeding in the New York State Supreme Court, County of New York, or in the United States District Court for the Southern District of New York and agrees that service of process upon the Borrower mailed by certified mail to the Borrowers' address shall be deemed in every respect effective service of process upon each of the Borrowers, in any such suit, action or proceeding.

(n)    <u>Indemnification</u>.

(i)    Each Borrower agrees to indemnify and hold harmless Lender, and its Affiliates, directors, officers, members, employees, agents, attorneys and representatives (each, an "Indemnified Person"), promptly, on demand, from and against all litigation, suits, actions, proceedings, claims (pending or threatened), damages, losses, liabilities and expenses (including, but not limited to, attorneys' fees and disbursements and other costs of preparation, investigation or defense, including those incurred upon any appeal), which may be instituted or asserted against or incurred by any such Indemnified Person in connection with, or arising out of, the Loan, the Other Agreements, the documentation related thereto, any other loan related thereto, any actions or failures to act in connection therewith, and any and all liabilities and legal costs and expenses arising out of or incurred in connection with any disputes between or among any parties to any of the foregoing, and any investigation, litigation, or proceeding related to any such matters.

(ii)    An Indemnified Person shall have the right to retain separate legal counsel of its own choice to conduct the defense and all related matters in connection with any such litigation, suit, action, proceeding or claim.  The Borrowers shall pay the fees and expenses of such legal counsel, and such legal counsel shall to the fullest extent consistent with its professional responsibilities cooperate with the Borrowers and any legal counsel designated by the Borrowers.  The Borrowers agree to consult in advance with each Indemnified Person with respect to the terms of any proposed waiver, release or settlement of any claim, liability, proceeding or other action against the Borrowers to which an Indemnified Person may also be

subject, and to use its best efforts to afford the opportunity to join in such waiver, release or settlement.

(iii)    These Indemnification Provisions shall remain in full force and effect and shall survive the repayment of the Indebtedness and shall be in addition to any liability that the Borrowers might otherwise have to any Indemnified Person under this Agreement or otherwise.

(iv)    Notwithstanding the foregoing, Borrowers shall not be liable for indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damages, loss, liability or expense results primarily from that Indemnified Person's gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction. Under no circumstances shall Lender or its Affiliates, directors, officers, members, employees, agents, attorneys or representatives be liable to Borrowers or any other person for any punitive, exemplary, consequential or indirect damages which may be alleged to result from the Loan, the documentation related thereto, any other loan or any actions or failures to act in connection therewith.

[signature page follows]

IN WITNESS WHEREOF, each Borrower and Lender have executed this Agreement as of the date set forth above.

**Lender:**                                        **Borrowers:**

Knickerbocker Funding LLC

                                                   Timothy Sammons Inc.

By: _____              By: _____
Name: _____              Name: _____
Title: _____            Title: _____

Address for Notice:                       Address for Notice:

41 East 57th Street, Suite 702            19 East 66th Street
New York, New York 10022                  New York, New York 10065
Telefax No.:  (212) 230-1006              Telefax No.: (212)

                                          Timothy Sammons

                                          By: _____
                                          Name: Timothy Sammons
                                          (individually)

                                          Address for Notice:

                                          19 East 66th Street
                                          New York, New York 10065
                                          Telefax No.: _____

[signature page to Loan and Security Agreement]

## EXHIBIT A

**Collateral and location:**

To be Held by Art Finance Partners LLC, New York or at London shipper (until export permit has been granted):

**Joachim Wtewael (1566 – 1638)**
CARITAS, c. 1620-1628
Signed on basket
Oil on panel
38.4 x 59 cm

Literature: Anne.W. Lowenthal, *Joachim Wtewael and Dutch Mannerism*, Doornspijk, The Netherlands, 1970, p.152, no. A-89.

TO BE INSURED BY BORROWER